❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.24-857M(NJ) |
| Information about the location of the cellular telephone | ) |
| assigned call number (262) 307-1746 | )    **Matter No.: 2023R00468** |
| ("TARGET CELL PHONE") | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before 6/19/2024_____ *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.     x❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Nancy Joseph_____.
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____.

Date and time issued: 6/5/2024____ @ 8:40 a.m.

City and state:    Milwaukee, Wisconsin_____

*Judge's signature*

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the cellular device assigned call number (262) 307-1746 (referred to herein and in Attachment B as "**TARGET CELL PHONE**") that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquarter at 1095 Avenue of the Americas; New York, New York 10036.

2.      The **TARGET CELL PHONE**.

**ATTACHMENT B**

**Particular Things to be Seized**

I.      Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

   a. The following subscriber information about the customers or subscribers associated with:

   i.  Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.  Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **TARGET CELL PHONE** including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **TARGET CELL PHONE** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **TARGET CELL PHONE** will connect at the beginning and end of each communication.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **TARGET CELL PHONE**.

c. Information about the location of the **TARGET CELL PHONE** for a period of 30 days, during all times of day and night. "Information about the location of **TARGET CELL PHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government

3

shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b), involving Arianna NZE, George WOODS, Darius JARRETT, Kenneth BEVERLY, Carlos GARZA, Dante MCDONALD, Corey HUDSON, Decerdric DAVIDSON and other unknown persons prospectively for a period of 30 days from the date of this warrant.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.

4

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information about the location of the cellular telephone<br>assigned call number (262) 307-1746<br>("TARGET CELL PHONE") | )<br>)<br>)<br>)<br>)<br>)    Case No.24-857M(NJ)<br>**Matter No.: 2023R00468** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1), 846 & 843(b) | Distribution of a Controlled Substance, Conspiracy to Distribute a Controlled Substance, and Unlawful Use of a Communication Facility |

The application is based on these facts:

See attached Affidavit

❑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JEFFREY MILAM    Digitally signed by JEFFREY MILAM
Date: 2024.06.03 14:02:15 -05'00'

*Applicant's signature*

SA Jeffrey Milam, DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone

_____ *(specify reliable electronic means).*

Date: 6/5/2024

*Judge's signature*

City and state:   Milwaukee, Wisconsin     Hon. Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT
### Matter No.: 2023R00468

I, Jeffrey Milam, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (262) 307-1746 (**TARGET CELL PHONE**). The service provider for the **TARGET CELL PHONE** is Verizon Wireless ("Service Provider"), a wireless telephone service provider headquartered at 1095 Avenue of the Americas; New York, New York 10036. The **TARGET CELL PHONE** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **TARGET CELL PHONE**.

3.      I am a Special Agent with the Drug Enforcement Administration and have been since September 2014. Before that, I was employed as a police officer with the St. Louis County Police Department in St. Louis, Missouri, where I spent the last three years as a Task Force

Officer with the DEA. During my tenure as a Special Agent, I have been involved primarily in the investigation of large-scale drug traffickers operating not only in the City of Milwaukee and the State of Wisconsin, but also throughout the entire United States based upon the direction of investigations that arise through the Milwaukee District Office of the Drug Enforcement Administration.

4.     As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency, and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses, which specialized in the investigation of drug trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived

2

proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

5.    Based upon my training and experience, as well as information relayed to me during the course of my official duties, I know that a significant percentage of controlled substances, specifically marijuana, cocaine, heroin, and methamphetamine, imported into the United States comes from Mexico and enters the domestic market at various points along the southwest border of the United States, because Mexican cartels control the transportation, sale, and importation of cocaine, marijuana, heroin, and methamphetamine into the United States.

6.    Based on my training, experience, and conversations with other law enforcement officers, I know that distributors of marijuana, methamphetamine, cocaine, heroin, as well as other controlled substances, often use cellular and landline telephones.  Additionally, I know that drug traffickers often change their phone numbers and cellular devices on a frequent basis in an attempt to thwart law enforcement from tracking their phones and to conceal their identities. I know that these individuals often use code words to discuss controlled substances and methods of concealing controlled substances while talking on the telephone. I know that drug traffickers often conduct extensive counter-surveillance to avoid law enforcement detection. Based upon training and experience, I know that narcotics-trafficking and money-laundering organizations routinely use several operational techniques to sustain their illegal enterprises. These practices are designed and implemented to achieve two paramount goals: (1) the successful facilitation of the organization's illegal activities, including the importation and distribution of controlled substances, and the subsequent repatriation of the proceeds of that illegal activity; and (2) the minimization of the exposure of coconspirators, particularly those operating in leadership roles, from investigation and prosecution by law enforcement.

3

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b) have been committed, are being committed, or will be committed by Arianna NZE, (DOB: 04/05/1991), George WOODS (DOB: 01/23/1975), Darius JARRETT (DOB: 01/29/1972), Kenneth BEVERLY (DOB: 05/23/1976), Carlos GARZA (DOB: 11/12/1964), Dante MCDONALD (DOB: 07/09/1979), Corey HUDSON (DOB: 01/08/1977), Decerdric DAVIDSON (DOB: 12/02/1981) and other unknown persons, collectively identified as the WOODS Drug Trafficking Organization (DTO). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

9.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

10.     The United States, including the Drug Enforcement Administration, is conducting a criminal investigation into Arianna NZE, George WOODS, Darius JARRETT,

2

Kenneth BEVERLY, Carlos GARZA, Dante MCDONALD, Corey HUDSON, Decedric DAVIDSON and other unidentified subjects for possible violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b).

11.    In late 2023, case agents debriefed a confidential source (hereinafter referred to as the CS), [1] who provided information on a large-scale drug distributor, identified as George WOODS. The CS stated s/he was recently introduced to WOODS through an acquaintance in Milwaukee, Wisconsin. The CS stated WOODS distributes large quantities of cocaine, heroin, and marijuana throughout the Midwest region of the United States. The CS stated WOODS indicated that WOODS makes bi-monthly trips to Texas, where WOODS meets with a currently unknown source of supply (SOS) near the U.S./Mexico border to obtain upwards of two hundred (200) kilograms of cocaine and/or heroin, and one thousand (1,000) to two thousand (2,000) pounds of marijuana. WOODS utilizes a currently unknown method to transport narcotics from the southern Texas border, to various locations throughout the United States, including Milwaukee, Wisconsin; Chicago, Illinois; and Arizona. The CS stated WOODS owns/operates a trucking company, owns multiple properties, and multiple luxury vehicles, all of which are believed to be paid for with drug proceeds. The CS stated WOODS frequented a multi-unit apartment building in Milwaukee, later identified as 915 N. 24th Street, Milwaukee, Wisconsin.  The CS stated a black male subject known only as "BUNK," oversees the day-to-

---

1 For several reasons, case agents believe the CS's information is reliable and credible. Substantial parts of the CS's information have been independently corroborated and verified by law enforcement. The CS has made direct observations, which were further corroborated and verified by law enforcement. The CS's information has been consistent with information obtained from travel records, telephone toll records, social media records, public databases, and surveillance. The CS has also provided information on violent crimes unrelated to this investigation, leading to the arrests of multiple suspects. The CS has prior convictions for theft, possession of controlled substances, possession of a firearm by a felon, manufacture or deliver controlled substances, and parole violations. The CS is cooperating for financial compensation.

day operations/distribution of narcotics at 915 N. 24th Street. The CS added that WOODS uses multiple apartments within this building to store and distribute narcotics.

12.     WOODS indicated to the CS that his (WOODS's) Texas-based source of supply (SOS) can obtain large quantities of narcotics for WOODS. WOODS further indicated that WOODS flies to Texas via commercial carrier before driving to the U.S./Mexico border to facilitate the drug transactions with the SOS. WOODS identified the SOS as "CORTO." The CS provided WOODS's telephone number of (414) 406-2832. The CS was later shown a Wisconsin Department of Transportation (DOT) photograph of WOODS (without identifiers), which the CS positively identified as WOODS.

13.     In late November 2023, the CS stated that s/he was present at 915 N. 24th Street, Milwaukee, Wisconsin when WOODS brought approximately twenty (20) kilograms of suspected cocaine and/or heroin into the building. The CS stated WOODS arrived in a black Cadillac Escalade from which WOODS removed three duffle bags containing the approximate twenty kilograms of drugs. WOODS placed the duffle bags and their contents into a first-floor apartment which was occupied by unknown subjects. The CS saw the approximately twenty brick-sized objects and observed a vintage photograph of a male wearing a large hat with two Bandoliers draped across his chest attached to the outside of one of the kilogram wrappings. The CS further confirmed that there is a main entrance door on the south-side of 915 N. 24th Street. The CS has used this entrance on previous occasions.

14.     On November 29, 2023, case agents conducted surveillance of 915 N. 24th Street. At this time, case agents observed a black Chevrolet Suburban parked directly in front of the residence. The Chevrolet Suburban displayed a Texas temporary registration of 4267H51. Through a law enforcement database, the registration listed to Kenneth D. BEVERLY, 914 Blewit Dr. Cedar Hill, Texas for a 2017 Chevrolet Suburban. The vehicle appeared to be

4

purchased from Gerald's Auto Sales Inc., located at 208 NW 28th Street, Fort Worth, Texas. Case agents also observed a blue 2006 Dodge Durango with Ohio registration JDE9086 registered to a Darius JARRETT at 101 Towne Commons Way, Apt. 11, Cincinnati, Ohio. The Dodge Durango was parked directly across the street from 915 N. 24th Street.

15.     At approximately 11:57 a.m., case agents observed a black male, wearing a black and grey beard, walk from the south-side of 915 N. 24th Street toward the Dodge Durango. The black male subject opened the driver door to the Dodge and leaned inside momentarily before entering and departing in a maroon Buick Park Avenue, which had been parked in front of the Dodge Durango. Case agents later obtained a Wisconsin DOT photograph of Darius JARRETT, who strongly resembled the black male observed accessing the Dodge Durango, before departing in the Buick Park Avenue.

16.     Case agents conducted telephone toll analysis of WOODS's telephone and identified frequently called numbers. Through a law enforcement database, the top two numbers – (414) 416-3339 and (414) 915-3092 – list to a Shanequa Collins. Case agents queried social media (Facebook) inputting the name "Shanequa Collins," and identified a profile by the name "Nene Bre'Arie." In the public photos section of this profile, case agents identified numerous recent photographs of a black female subject posing with a black male subject, who case agents positively identified as WOODS. Case agents believe Collins is the girlfriend of WOODS.

17.     The third most frequent contact of WOODS's is telephone number (817) 707-5423. A law enforcement database lists the user of the telephone as Carlos J. GARZA. GARZA lists an address in Fort Worth, Texas. Case agents further conducted telephone toll analysis of telephone (817) 707-5423.  Initial overlaps were identified between WOODS's telephone 1 and telephone (817) 707-5423. Specifically, in addition to contact with each other, both WOODS's telephone and telephone number (817) 707-5423 were in frequent contact with telephone

5

number – (414) 336-9608. This telephone number was listed in a law enforcement database to Kenneth BEVERLY. BEVERLY was previously identified as the recent owner of the 2017 Chevrolet Suburban observed at 915 N. 24th Street in late November (detailed above in paragraph 14). Based on the investigation to date, case agents believe that GARZA, may be associated with "CORTO", the alleged Texas-based source of supply to WOODS.

18.     Another frequent contact of WOODS's telephone is (414) 574-6421. Through a law enforcement database, this telephone lists to a Darius JARRETT. Additionally, JARRETT was the subject of an anonymous drug tip submitted to the DEA Milwaukee District Office. In the drug tip, JARRETT was identified as a large-scale cocaine and fentanyl distributor, who uses telephone numbers (414) 574-6421 (in contact with WOODS's telephone) and (262) 765-1263. The drug tip also stated that JARRETT drives a blue Dodge Durango with Ohio registration JDE9086, a vehicle previously identified by case agents during surveillance (detailed above in paragraph 14).

19.     Case agents continued to exploit social media databases and identified a male appearing in several Facebook photographs alongside WOODS and others. The male appeared to be an older black male, with a black and grey beard, and wearing designer sunglasses. Utilizing a law enforcement database, case agents tentatively identified this black male as Dante MCDONALD. The CS was shown a Wisconsin DOT photograph of MCDONALD (without identifiers), who the CS positively identified as "BUNK."

20.     Through additional toll analysis of WOODS's telephone, case agents identified another frequently contacted number as (414) 937-1099, subscribed to Corey HUDSON. HUDSON is a black male with DOB: 01/08/1977. Case agents later showed the CS a DOT photograph of HUDSON (without identifiers), who the CS positively identified as

"COREY." The CS further stated that "COREY" (HUDSON) is one of WOODS's top narcotics distributors.

21.　　Case agents later identified telephone number (414) 573-7220 as a frequent contact of WOODS's telephone. In a law enforcement database, this number is listed to Dante MCDONALD of 915 N. 24th Street, Apt. 11, Milwaukee, Wisconsin.

22.　　Another telephone number identified as being in frequent contact with MCDONALD, WOODS, and having infrequent contact with HUDSON and DAVIDSON, was telephone (262) 307-1746 (hereinafter the **TARGET CELL PHONE**). At this point in the investigation, case agents were unaware of the user of the **TARGET CELL PHONE** or it's user's role in the WOODS DTO.

23.　　On December 8, 2023, the Honorable Stephen C. Dries, U.S. Magistrate Judge, Eastern District of Wisconsin authorized an order for a Pen Register Trap & Trace and search warrant for GPS precision location information on WOODS's telephone.

24.　　During the monitoring period, WOODS's telephone showed to be in both the Milwaukee, Wisconsin and Fort Worth, Texas regions. On December 8, 2023, at approximately 6:58 p.m., WOODS's telephone was showing to be in the area of W. Risinger Road and Old Granbury Road in Fort Worth, Texas. This appeared to be a newer residential subdivision. Case agents previously queried a social-media database (Facebook), identifying a profile believed to be utilized by Shanequa Collins (referenced in paragraph 16). During this query, case agents observed posts appearing to show a residence recently purchased by Collins.  Utilizing additional open-source databases, case agents tentatively identified 6700 Rosby Ave., Fort Worth, Texas as the residence.

25.　　During the week of December 11, 2023, WOODS's telephone was in frequent contact with MCDONALD, HUDSON, GARZA, BEVERLY, JARRETT, and COLLINS. On

7

December 12, 2023, throughout the day, WOODS's telephone appeared to be in close proximity to three municipal airports in the Fort Worth, Texas and Dallas, Texas regions. WOODS's telephone remained in the general area of the airports for approximately thirty minutes to one and a half hours, before appearing to move from the area. Based on WOODS's telephone location data placing it within close proximity to three municipal airports, case agents believe that WOODS may be utilizing the municipal airports to facilitate the transportation of drugs to other areas of the continental U.S. and/or drug proceeds across the border into Mexico.

26.     On December 14, 2023, at approximately 5:42 a.m., WOODS's telephone was in the area of the Dallas Love Field Airport in Dallas, Texas. At approximately 10:57 a.m., WOODS's telephone was showing to be in the area of Milwaukee Mitchell International Airport. Case agents established surveillance in the Milwaukee, Wisconsin region in anticipation of WOODS's return. At approximately 12:32 p.m., WOODS's telephone was showing to be in the area of W. Brown Deer Road and N. Green Bay road in Brown Deer, Wisconsin. At approximately 12:34 p.m., case agents observed a black Chevrolet Tahoe with Texas registration TNH-2156 traveling south on N. Deerbrook Trail from W. Brown Deer Road. The registration listed to Kevie Timmons, 3516 Grandy Street, Fort Worth, Texas for a 2021 Chevrolet Tahoe. The black Tahoe turned into The Bevy Apartments, located at 8600 N. Deerwood Dr., Brown Deer, Wisconsin. At this same time, WOODS's telephone was showing to be in the general area of The Bevy Apartments.

27.     The black Tahoe parked directly in front of 8720 N. Deerwood Dr. as the driver exited the vehicle. The driver stood near the rear hatch of the black Tahoe and was positively identified by case agents as MCDONALD. MCDONALD stood outside the black Tahoe for several minutes appearing to wait for someone or something. Approximately fifteen minutes

8

later, a white Mercedes SUV pulled into the same apartment complex, and entered a parking structure located below 8720 N. Deerwood Dr. The Mercedes, a 2021 Mercedes GLS, displayed Wisconsin registration ATF-1713, registered to a Shanequa Collins. Case agents observed the Mercedes was occupied by a driver and front passenger. Case agents previously learned that Collins was the girlfriend of WOODS, and further believed that WOODS and Collins were the occupants of the Mercedes as it arrived at the apartment complex.

28.     At approximately 12:56 p.m., case agents observed a black male exit from the main lobby door of 8720 N. Deerwood Dr. The black male was positively identified by case agents as WOODS. WOODS was wearing a red/white baseball cap, and red hoodie as he entered the driver seat of the black Tahoe. Case agents could see a second occupant of the black Tahoe**,** later determined to be MCDONALD.

29.     WOODS and MCDONALD departed in the black Tahoe followed by case agents. As the black Tahoe traveled south towards Milwaukee, case agents believed WOODS and MCDONALD were traveling to 915 N. 24th Street. In anticipation of this, case agents established surveillance in the immediate area of 915 N. 24th Street. At approximately 1:32 p.m., case agents observed the black Tahoe park in front of 915 N. 24th Street. WOODS and MCDONALD exited the black Tahoe, before walking toward the south entrance of 915 N. 24th Street.

30.     Case agents remained in the area, and at approximately 1:57 p.m., WOODS and MCDONALD were observed walking back to the black Tahoe from the south side of 915 N. 24th Street. At this time, WOODS was rolling a large silver suitcase on the ground. WOODS placed the silver suitcase into the rear driver seat compartment. As WOODS lifted the suitcase, case agents observed WOODS momentarily struggle, suggesting that the suitcase contained

9

something heavy. WOODS and MCDONALD departed in the black Tahoe as case agents terminated surveillance.

31.      Case agents continued to monitor the movements of WOODS's telephone upon WOODS/MCDONALD's departure from 915 N. 24th Street. At approximately 2:45 p.m., WOODS's telephone was showing to be in the area (1164 meter proximity) of Good Hope Road and N. 48th Street in Milwaukee, Wisconsin. The exact plot (GPS coordinates) showed WOODS's telephone to be directly over the Extra Space Storage business, located at 5115 Good Hope Road. Milwaukee, Wisconsin. Approximately thirty-minutes later, WOODS's telephone was showing to be back in the area of The Bevy Apartments in Brown Deer, Wisconsin.

32.      On December 18, 2023, case agents went to Extra Space Storage (at the above business location) to serve an administrative subpoena. Case agents requested a list of all rental units currently being rented, including the names and unit numbers. Case agents later received a "rent roll" from the business. Case agents identified a renter name of "Dante McDonald," move-in date of 04/17/2023, unit #218. Case agents identified two storage units under the name of "Hudson Corey," unit #332 (move-in date 01/01/2018), and unit #227 (move-in date 03/23/2023). Case agents are aware that drug traffickers will utilize public storage locations to store drugs/drug proceeds in order to compartmentalize their activities. Case agents believe that on December 14, 2023, WOODS and MCDONALD visited the Extra Space Storage after WOODS placed the large suitcase in the black Tahoe before departing 915 N. 24th Street.

33.      In early January 2024, case agents spoke to the CS. The CS advised that WOODS planned to resume operations after the holiday season. WOODS also told the CS that MCDONALD is currently overseeing logistics of the WOODS DTO. WOODS explained that MCDONALD, working on behalf of WOODS and unknown associates, was coordinating drug transportation routes. WOODS added that MCDONALD would be traveling to Texas at the

10

beginning of January 2024. Case agents confirmed that on January 1, 2024, at approximately 4:18 p.m., the black Tahoe was captured (LPR) traveling south on Interstate 57 near 159th Street in Illinois. Based on this information, case agents believe that MCDONALD was driving the black Tahoe to Texas on January 1, 2024 to coordinate future drug/money transactions on behalf of the WOODS DTO.

34. On January 5, 2024, the Honorable Stephen C. Dries, U.S. Magistrate Judge, Eastern District of Wisconsin, authorized a search warrant for the extension of an order for a Pen Register Trap & Trace and search warrant for GPS precision location information on WOODS's telephone (Case No. 23-M-512).

35. On January 5, 2024, the Honorable William E. Duffin , U.S. Magistrate Judge, Eastern District of Wisconsin, authorized a search warrant for the installation of a GPS tracking device for the black 2021 Chevrolet Tahoe, used by members of the WOODS DTO (Case No. 24-MJ-8). On January 8, 2024, case agents successfully installed the GPS tracking device on the black Tahoe.

36. On January 9, 2024, case agents monitored the location of the GPS tracking device on the black Tahoe, which showed it to be in the area of N. Sherman Blvd. and W. Roosevelt Rd. in Milwaukee, Wisconsin. Case agents established surveillance in the immediate area, and observed the black Tahoe parked in the driveway of 3817 N. Sherman Blvd., Milwaukee, Wisconsin.  Case agents later observed MCDONALD exit the residence, where he briefly accessed the rear passenger compartment, before returning to the residence. Through a law enforcement query, case agents tentatively identified Renee Crawford as the current occupant of 3817 N. Sherman Blvd. During toll analysis of MCDONALD's telephone, the top contact of MCDONALD was telephone (414) 238-7759. In a law enforcement database, this telephone is listed to a Renee Crawford.

11

37.     In mid-January 2024, case agents spoke with the CS. The CS stated in early January 2024, WOODS told the CS that they (i.e., WOODS DTO members) were currently picking up "two hundred (200) more." The CS believed that WOODS was referring to the WOODS DTO obtaining two hundred kilograms of cocaine and/or heroin. The CS further stated that WOODS was planning to travel to California in the near future to obtain bulk marijuana from an as-yet-unidentified source of supply (SOS).

38.     On January 16, 2024, case agents monitored the GPS tracking device on the black 2021 Tahoe. At approximately 3:51 p.m., the black Tahoe appeared to be traveling south near 3817 N. Sherman Blvd. At approximately 7:30 p.m., the black Tahoe was showing to be in the area of N. 58th Blvd. and W. Vienna Ave. Through a law enforcement database, case agents identified 3844 N. 58th Blvd., Milwaukee, Wisconsin as MCDONALD's residence in 2018. This residence is within close proximity to the above-described cross streets of N. 58th Blvd. and W. Vienna Ave.

39.     On January 17, 2024, at approximately 12:59 a.m., case agents received a LPR alert on the black 2017 Suburban. The black Suburban was captured traveling southbound on I90/I94 near Grand Ave. in Gurnee, Illinois. At this same time, case agents received a LPR alert on the black 2021 Tahoe, indicating it was in the same area. Case agents believe MCDONALD and other unidentified members of the WOODS DTO were operating the black Suburban and black Tahoe, as they caravanned southbound in Illinois. There were no additional LPR alerts on either vehicle; however, the GPS tracking device on the black Tahoe showed it arriving at Midway International Airport – located at 5700 S. Cicero Ave. Chicago, IL at approximately 7:29 p.m.

40.     Case agents later spoke with the CS, who stated WOODS was planning to fly to California to meet with his marijuana source of supply (SOS). WOODS previously told the

12

CS that members of the WOODS DTO obtain approximately one ton (2000 lbs.) of marijuana at a time from the as-yet-unidentified California-based marijuana SOS. Case agents were also monitoring the court-authorized collection of location data from WOODS's telephone. On January 17, 2024, at approximately 10:50 a.m., WOODS's telephone was showing to be in the area of the Dallas Love Field airport – located at 8008 Herb Kelleher Way Dallas, Texas. At approximately 3:33 p.m., WOODS's telephone was showing to be in the area of the Sacramento International Airport – located at 6900 Airport Blvd., North Natomas, CA.

41.     On this same date, WOODS's telephone was in contact with telephone number (530) 965-7017 on five (5) occasions. The subscriber of telephone number (530) 965-7017 is Kyle Anthony Silvalarva of 14121 Temple Cir., Magalia, CA. Silvalarva has a prior conviction for Transport/Sell Narcotic/Controlled Substance. In addition, WOODS's telephone was in contact with MCDONALD's telephone on three (3) occasions on this same date.

42.     During a telephone toll comparison between WOODS's telephone and MCDONALD's telephone in early February 2024, there were thirty-three (33) common contacts. Significant common contacts included the **TARGET CELL PHONE** (believed to be used by NZE), HUDSON, JARRETT, TIMMONS (registered owner of the 2021 Chevrolet Tahoe), BEVERLY (registered owner of the 2017 Chevrolet Suburban), HOPGOOD, GARZA, and DAVIDSON. In addition, WOODS's telephone and MCDONALD's telephone are in frequent daily contact.

43.     On February 5, 2024, case agents monitored the court-authorized GPS vehicle tracking device on the Tahoe. The Tahoe appeared to depart the Milwaukee, Wisconsin region during the afternoon of February 5, 2024. The Tahoe arrived in the area of Fort Worth, Texas on February 6, 2024. More specifically, the Tahoe appeared to be in the immediate area of 1820 Lavin Plaza, Haslet, Texas. Through a law enforcement database query, case agents

13

learned that the most recent residents of this address were DAVIDSON and MCDONALD. WOODS was listed as a previous resident of 1820 Lavin Plaza. Based on previous surveillances of the WOODS DTO, case agents believe that DAVIDSON drove the Tahoe from Wisconsin to Texas on the above-mentioned dates.

44.     On February 6, 2024, the Honorable Stephen C. Dries, US Magistrate Judge, Eastern District of Wisconsin, approved a search warrant authorizing the continued collection of GPS precision location information on WOODS's telephone and MCDONALD's telephone (Case No. 24-M-319).

45.     On February 12, 2024, MCDONALD's telephone was still showing to be in the area of Fort Worth, Texas. At approximately 9:54 a.m., MCDONALD's telephone was showing to be in the vicinity of 1820 Lavin Plaza, Haslet, Texas. At approximately 11:00 a.m., MCDONALD's telephone was in the vicinity of 6700 Rosby Ave., Fort Worth, Texas. At this same time, WOODS's telephone was also in the vicinity of 6700 Rosby Ave. Case agents believe WOODS and MCDONALD met at 6700 Rosby Ave. during the morning of February 12, 2024. During previous conversations with the CS, the CS told case agents that WOODS indicated that they (i.e., the WOODS DTO) have a residence close by WOODS's current Texas residence (i.e., 6700 Rosby Ave., Fort Worth, Texas) that is used as a stash house. Based on this intelligence, case agents believe 1820 Lavin Plaza, Haslet, Texas is a potential stash house for the WOODS DTO.

46.     The Tahoe proceeded to 3844 N. 58th Blvd, Milwaukee, Wisconsin, where DAVIDSON exited with a small suitcase. MCDONALD departed in the Tahoe. At approximately 5:45 p.m., the GPS vehicle tracking device showed the Tahoe traveling north on N. 60th Street near W. Brown Deer Road. Case agents previously identified 9314 N. 60th Street, Brown Deer, Wisconsin as a possible residence associated with the WOODS DTO.

14

47. At approximately 6:00 p.m., case agents established surveillance in the immediate area of 9314 N. 60th Street. At this time, case agents observed the Tahoe backed up towards the rear detached garage. Case agents observed MCDONALD standing near the open rear hatch of the Tahoe, next to an open garage door. Over approximately the next thirty minutes, case agents observed three (3) additional SUV-style vehicles arrive in the driveway of 9314 N. 60th Street. Each time a new vehicle arrived, case agents observed other vehicles being repositioned in the driveway to allow the recently arrived SUV to park close to the garage. Due to the time of day, case agents were unable to obtain vehicle registrations on any of the vehicles. At approximately 6:35 p.m., case agents observed that the garage door(s) were shut and there were lights on inside the garage. Throughout this surveillance, MCDONALD's telephone was in the same general area of 9314 N. 60th Street. Case agents believe upon his return from Texas, MCDONALD arrived at 9314 N. 60th Street to oversee the arrival of multiple SUVs at a garage under the cover of darkness. Based on training, experience, and information learned at this point in the investigation, case agents believe the SUVs were delivering illegal drugs at the garage for temporary storage prior to further distribution.

48. On February 24, 2024, case agents monitored the location information on MCDONALD's telephone as it traveled south towards Illinois. On February 25, 2024, MCDONALD's telephone arrived in the general area of 1820 Lavin Plaza, Haslet, Texas. During MCDONALD's travel from Wisconsin to Texas, MCDONALD's telephone was in frequent telephonic contact with the user of the **TARGET CELL PHONE**, DAVIDSON, WOODS, and JARRETT. Additionally, the **TARGET CELL PHONE** was in contact with WOODS three (3) times on February 24, 2024.

49. On February 26, 2024, case agents monitored the location of WOODS's telephone. At approximately 6:13 a.m., WOODS's telephone was in the area of the Dallas Love

15

Field Airport. At approximately 10:57 a.m., WOODS's telephone was in the area of the Los Angeles International Airport. Over the next several hours WOODS's telephone appeared to travel north until arriving in the Chico, California region. During this time, WOODS's telephone was in contact with telephone (530) 965-7017, subscribed to Kyle Silvalarva, the suspected marijuana SOS for the WOODS DTO.

50.     In the morning of February 27, 2024, MCDONALD's telephone was showing to be traveling north on I-94 in Illinois. Case agents established surveillance in the area of the interstate, and at approximately 9:25 a.m., located the black Chevrolet Suburban with Texas registration TNH-3171 as it approached the downtown Milwaukee region. Case agents maintained physical surveillance on the Suburban as it continued traveling north on HWY 175 to W. Lisbon Ave. At approximately 10:04 a.m., case agents observed the Suburban stop at an apartment complex, located at 6215 N. 84th Street, Milwaukee, Wisconsin. At this time, case agents observed a black female and two children exit from the Suburban, which departed the area. Case agents continued to follow the Suburban as it arrived at 3817 N. Sherman Blvd. The driver exited the vehicle and was positively identified as MCDONALD at this time.

51.     A law-enforcement database listed the **TARGET CELL PHONE** as one of NZE's telephone numbers.  The law-enforcement database also listed 6215 N. 84th Street Apt. 3, Milwaukee, Wisconsin (a unit in the apartment complex referenced in paragraph 50 above) as one of NZE's current  residences (as of mid-February 2024). Based on this, case agents believe MCDONALD drove NZE and her two children from Texas to Wisconsin where he later dropped NZE off at her 6215 N. 84th Street residence following MCDONALD's travels to the Fort Worth, Texas region on February 25, 2024.

52.     On February 27, 2024, case agents monitored the location of MCDONALD's telephone. At approximately 3:49 p.m., MCDONALD's telephone was showing to be in the

16

area of Midway International Airport in Chicago, Illinois. At approximately 10:23 p.m., MCDONALD's telephone was showing to be in the area of the Sacramento International Airport in Sacramento, California. Over the next two days, WOODS's telephone and MCDONALD's telephone appeared to be in the same general area of Chico, California. On February 29, 2024, at approximately 6:40 p.m., MCDONALD's telephone appeared to return to Dallas, Texas. On this same data, at approximately 2:41 p.m., MCDONALD's telephone appeared to return to Midway International Airport, via a layover at Denver International Airport in Denver, CO.

53.     On March 1, 2024, case agents were contacted by DEA Chicago investigators regarding a February 29, 2024 marijuana seizure at Midway International Airport. DEA Chicago investigators had conducted interdiction at the airport using a drug K-9 and identified a suitcase with the name Arianna Nze on the luggage airline tag. The luggage tag indicated the suitcase was on Southwest Airlines flight #WN199 from DEN (Denver International) to MDW (Midway International). Upon a positive K-9 alert on the suitcase, investigators identified a second matching suitcase with NZE's name on the airline tag. The two suitcases were placed back into circulation while investigators conducted surveillance. Around this time, a male grabbed both suitcases and was immediately approached by investigators. The male was identified as Dante MCDONALD. MCDONALD stated the suitcases did not belong to him, but he planned to steal them. MCDONALD provided telephone (414) 573-7220 as his number. Investigators also obtained NZE's telephone number, which was the number for the **TARGET CELL PHONE**. Investigators called NZE, who stated she was in the restroom but would respond to baggage claim to collect her bags. NZE failed to arrive at the baggage claim, and the two suitcases were declared abandoned.  MCDONALD was released at the scene and was not charged with any crimes.

54.     DEA Chicago investigators opened the two suitcases, which contained approximately fifty-two (52) pounds of suspect marijuana. On March 5, 2024, DEA Chicago investigators transferred the suitcases and their contents to DEA Milwaukee case agents. The marijuana was packaged in one-pound quantities. There were numerous hand-written names on each package, such as "Goblin Cush," "Apple Fritter," and "Yellow Cake." Case agents are aware that these names are indicative of a specific strain of marijuana, typically considered "higher-quality" marijuana. Case agents believe WOODS and MCDONALD, with the assistance of NZE, traveled to Chico, California to conduct a drug/money transaction with their marijuana SOS (Silvalarva). Case agents believe MCDONALD used NZE's luggage to illegally transport the approximately fifty-two (52) pounds of suspect marijuana from California to Chicago, Illinois, which would then be driven north to Milwaukee, Wisconsin for further distribution. Case agents later conducted toll analysis and observed that the **TARGET CELL PHONE** was in frequent contact with both WOODS's telephone and MCDONALD's telephone throughout WOODS's and MCDONALD's trip to Chico, California.

55.     On March 11, 2024, the Honorable Stephen C. Dries, U.S. Magistrate Judge, Eastern District of Wisconsin, approved a search warrant authorizing the continued collection of GPS precision location information on WOODS's telephone and MCDONALD's telephone (Case No. 24-M-319 and Case No. 24-M-320).

56.     On March 19, 2024, case agents conducted surveillance of MCDONALD in Milwaukee, Wisconsin. At approximately 12:15 p.m., the location of MCDONALD's telephone showed it to be in the general area of N. 24th Street and W. State Street in Milwaukee, Wisconsin. At approximately 12:30 p.m., case agents established surveillance in the immediate area of 915 N. 24th Street, Milwaukee, Wisconsin and observed the black Chevrolet Suburban parked in front of the residence.

18

57.     At approximately 1:10 p.m., case agents observed a male walk from the south side entrance of 915 N. 24th Street. The male was wearing green clothing and carrying a medium-size brown box. At this time, case agents positively identified the male as MCDONALD, who placed the medium-size brown box inside the Suburban before departing in the vehicle. The brown box appeared to be empty. Case agents believed that MCDONALD and other members of the WOODS DTO were using a U-Haul storage facility, located at 7677 W. Appleton Ave., Milwaukee, Wisconsin, to store drugs/drug proceeds. In anticipation of MCDONALD traveling to the U-Haul storage facility, case agents established pre-surveillance in the vicinity of 7677 W. Appleton Ave., Milwaukee, Wisconsin.

58.     At approximately 1:30 p.m., case agents observed the Suburban pull into the business lot of the U-Haul storage facility, and MCDONALD exit the driver's side of the Suburban. Due to passing traffic, case agents momentarily lost visual on MCDONALD. Approximately five minutes later, case agents observed MCDONALD walking away from the U-Haul business entrance towards the Suburban. MCDONALD appeared to be carrying a brown box similar in size to the box he was carrying as he departed 915 N. 24th Street. At this point, however, the box appeared sealed with tape and heavier, as MCDONALD used both arms to place it inside the Suburban. Case agents terminated physical surveillance at this time.

59.     Later in the day, case agents reviewed electronic surveillance of 915 N. 24th Street. At approximately 1:54 p.m., the Suburban parked in front of the residence. The driver departed the vehicle while carrying a brown box under his left arm. Based on the driver's movements, the box appears weighted as he carried it into the south side entrance of 915 N. 24th Street. Based on their observations, case agents believe MCDONALD was the driver and that he had obtained narcotics from the U-Haul storage facility, which he placed in the brown box and later transported to 915 N. 24th Street.

19

60.     On March 26, 2024, case agents, in concert with electronic surveillance, established physical surveillance at 9314 N. 60th Street, Brown Deer, Wisconsin, a known location used by the WOODS DTO. At approximately 9:46 a.m., case agents observed MCDONALD arrive at the location in the black Chevrolet Suburban. Case agents observed MCDONALD, and two unidentified males, remove a spare tire from the Suburban and then replace it approximately 30 minutes later. Case agents previously observed similar activity involving the Suburban's spare tire. Based upon their training, experience and familiarity with the investigation, case agents believe that members of the WOODS DTO secret narcotics and drug proceeds in spare tires in trips between Texas and the Midwest. After the spare tire was re-installed on the Suburban location data from MCDONALD's telephone indicated the device was moving southbound on I94, which has been the route MCDONALD has previously used when traveling to Texas. Over the next several hours, location data for MCDONALD's telephone indicated the device was continuing to move in a southwest direction. On March 27, 2024, at approximately 9:29 a.m., location data for MCDONALD's telephone indicated the device was in the Dallas/Fort Worth, Texas region. At approximately 10:27 a.m., location data for MCDONALD's telephone indicated the device was in the area (2507 meter-proximity) of 1820 Lavin Plaza, Haslet, Texas.

61.     On March 27, 2024, at approximately 9:44 a.m., WOODS's telephone was showing to be in the general area (961 meter-proximity) of 6700 Rosby Avenue, Fort Worth, Texas. At approximately 10:15 a.m., WOODS's telephone appeared to be traveling north toward Haslet, Texas. At approximately 10:36 a.m., WOODS's telephone was showing to be in the general area (4448 meter-proximity) of 1820 Lavin Plaza, Haslet, Texas. Additionally, the GPS tracking data for the Tahoe indicated the vehicle departing the area of 6700 Rosby Avenue around the same time that WOODS's telephone began moving north towards Haslet,

Texas. The GPS tracking data for the Tahoe later showed the vehicle was near 1820 Lavin Plaza at around 10:36 a.m. Based on this information, case agents believe WOODS drove the Tahoe from his residence to 1820 Lavin Plaza, where WOODS met with MCDONALD and other alleged co-conspirators in the WOODS DTO. At approximately 1:50 p.m., case agents with the DEA Fort Worth District Office conducted a spot-check of 1820 Lavin Plaza and observed the Tahoe backed into the residence's driveway. The attached garage to the residence was closed, and case agents observed no other vehicles. While remaining in the area, the case agents observed a black male exit the front door of 1820 Lavin Plaza. The male was positively identified as MCDONALD.

62.    On April 10, 2024, the Honorable Stephen C. Dries, U.S. Magistrate Judge, Eastern District of Wisconsin, approved a search warrant authorizing the continued collection of GPS precision location information on WOOD's telephone and MCDONALD's telephone number (Case No. 24-M-319).

63.    In late April 2024, case agents spoke with the CS. The CS stated WOODS was planning to re-up with his SOS in the next few weeks. WOODS indicated that he would be directly handling this process, instead of MCDONALD. WOODS also indicated that the DTO may be looking for new stash house locations in Milwaukee, Wisconsin.

64.    On May 2, 2024, case agents, in concert with electronic surveillance, established physical surveillance of 9314 N. 60th Street, Brown Deer, Wisconsin. During this time, the location data for MCDONALD's telephone showed it in the area of N. 60th Street and W. Silver Brook Ln. in Brown Deer (in close proximity to 9314 N. 60th Street). At approximately 10:06 a.m. (electronic time-stamp), the black Chevrolet Suburban was observed backing up in the driveway of 9314 N. 60th Street before parking next to the garage. The male driver exited the Suburban and stood with another male next to the rear of the

21

vehicle. The driver was wearing a white t-shirt, and based on physical appearance, appeared to be MCDONALD. Over the next several minutes, the other male appeared to lower the spare tire underneath the Suburban, which was then rolled towards the garage. Minutes later, the other male rolled a tire toward the Suburban as MCDONALD stood nearby.

65. At 10:16 a.m. (electronic time-stamp), MCDONALD appeared to reach inside the rear hatch of the Suburban and removed a large dark object that he placed on the ground. As MCDONALD walked toward the garage, he appeared to be pulling the object behind him. Based on these observations, case agents believe MCDONALD removed a suitcase with wheels from inside the Suburban and rolled it inside the garage of the residence. At 10:29 a.m. (electronic time-stamp), the other male appeared to roll a spare tire from the garage back to the Suburban. The other male appeared to go underneath the Suburban and secure the spare tire under the vehicle. Approximately three minutes later, MCDONALD entered the driver's side of the Suburban and departed the area. The other male entered a tan GMC van and departed the residence immediately after MCDONALD has left. Case agents confirmed through physical surveillance the Texas TNH-3171 registration on the Suburban, and the Wisconsin registration on the tan GMC van, registered to Eric Delano KNOX of 9314 N. 60th Street, Brown Deer, Wisconsin.

66. Case agents continued to monitor the location of MCDONALD's telephone. Over the next several hours, MCDONALD's telephone traveled south through Illinois. On May 3, 2024, at approximately 12:32 a.m., MCDONALD's telephone was showing to be near the Arkansas/Texas border. At approximately 3:48 a.m., MCDONALD's telephone was showing to be in the area (2507 meter-proximity) of 1820 Lavin Plaza, Haslet, Texas. More specifically, the GPS plot-point was marked directly on Lavin Plaza, just east of Hulson Trail. Based on training, experience, and information thus far gathered in this investigation, case

22

agents believe MCDONALD loaded up drug proceeds (secreted in spare tire[s]) while at 9314 N. 60th Street, Brown Deer, Wisconsin before driving directly to a suspected stash house, located at 1820 Lavin Plaza, Haslet, Texas, the following day on May 3, 2024. During toll analysis of WOODS's telephone, there were two contacts on May 3, 2024 with the **TARGET CELL PHONE**. Based on the timing of these contacts, case agents suspect NZE may have had some connection with MCDONALD's trip to 1820 Lavin Plaza, Haslet, Texas in the Suburban. During May 2024, NZE has been in contact with WOODS approximately six times, with the most recent contact occurring on May 28, 2024.

67. On May 6, 2024, case agents interviewed a source of information (SOI)[2] in the greater Milwaukee, Wisconsin region. The SOI had previously allowed a forensic download of his/her cellular telephone. While reviewing contacts in the SOI's telephone, investigators identified the **TARGET CELL PHONE** in the SOI's contacts. The SOI stated the **TARGET CELL PHONE** belonged to "Ari," a friend of the SOI. The SOI further stated "Ari" was a "courier" for an unknown DTO. Case agents provided investigators with a Wisconsin DOT photograph of NZE (without identifiers), whom the SOI positively identified as "Ari" (hereinafter NZE).

68. During the interview, the SOI reiterated that NZE "drives for a bunch of rich people." Case agents asked the SOI to clarify, and the SOI stated NZE told the SOI that she transports narcotics for unknown individuals. The SOI stated NZE may also transport drug

---

2 For several reasons, case agents believe the SOI's information is reliable and credible. Substantial parts of the SOI's information have been independently corroborated and verified by law enforcement. The SOI's information has been consistent with information obtained from travel records, telephone toll records, public databases, and surveillance. The SOI has also provided information on drug distribution activities unrelated to this investigation, leading to an on-going investigation. The SOI has prior convictions for possession of controlled substances, carrying a concealed weapon (CCW), and has a probation violation. The CS is cooperating for consideration in a criminal matter.

proceeds but was unaware of any specific details of her involvement with the alleged illicit activities. The SOI confirmed that NZE used the **TARGET CELL PHONE**.

69.     Case agents believe Arianna NZE, George WOODS, Dante MCDONALD, Darius JARRETT, Kenneth BEVERLY, Carlos GARZA, Corey HUDSON, Decerdric DAVIDSON and other as-yet-unidentified co-conspirators are continuing to use their respective call numbers to communicate among each other and with unknown co-conspirators to facilitate the receipt and further distribution of illegal controlled substances. Case agents also believe the activity observed at 915 N. 24th Street, 3817 N. Sherman Blvd., 3844 N. 58th Blvd., all located in Milwaukee, Wisconsin, and 9314 N. 60th Street, in Brown Deer, Wisconsin strongly indicates that members of the WOODS DTO are using these locations for the storage and distribution of illegal controlled substances, and the proceeds from the sale of those controlled substances.

70.     Case agents believe 1820 Lavin Plaza, Haslet, Texas, and 6700 Rosby Ave., Fort Worth, Texas are also being utilized by members of the WOODS DTO to further their drug distribution activities. Case agents believe that the monitoring of the **TARGET CELL PHONE** telephone location will assist in identifying NZE's alleged role as a drug/drug proceeds courier for the WOODS DTO, as well as potential sources of supply, distributors, and locations associated with this drug-trafficking organization. This includes the monitoring of WOODS's and MCDONALD's allegedly bi-monthly trips to Texas, where WOODS, MCDONALD or a yet unknown associate are believed to travel in proximity to the U.S./Mexico border to meet with source(s) of supply to obtain illegal controlled substances destined for Milwaukee, Wisconsin, and other destinations within the continental United States.

## TECHNICAL BACKGROUND

71.    In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

### Cell-Site Data

72.    Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **TARGET CELL PHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

25

## E-911 Phase II / GPS Location Data

73.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **TARGET CELL PHONE**, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on the Service Provider's network or with such other reference points as may be reasonably available.

## Pen-Trap Data

74.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity

26

("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

### Subscriber Information

75.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET CELL PHONE** user or users and may assist in the identification of co-conspirators.

### AUTHORIZATION REQUEST

76.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

77.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

78.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of

27

interference with the Service Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

79.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice for 90 days.  This investigation is expected to remain covert at least until then, so disclosing the warrant would alert targets or subjects about the existence of a federal investigation. Case agents will continue to request the same notification deadline for all warrants in this investigation, so that the notifications can be coordinated or extended as necessary. A single notification date will reduce the administrative burden on case agents and the Court, minimize the risks of disclosure, and promote judicial economy. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET CELL PHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

28

80.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET CELL PHONE** outside of daytime hours.

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the cellular device assigned call number (262) 307-1746 (referred to herein and in Attachment B as "**TARGET CELL PHONE**") that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquarter at 1095 Avenue of the Americas; New York, New York 10036.

2.      The **TARGET CELL PHONE**.

**ATTACHMENT B**

**Particular Things to be Seized**

I.      Information to be Disclosed by the Provider

     To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

     a.   The following subscriber information about the customers or subscribers associated with:

         i.    Names (including subscriber names, user names, and screen names);

        ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

       iii.   Local and long distance telephone connection records;

       iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.    Length of service (including start date) and types of service utilized;

       vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

       vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

      viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **TARGET CELL PHONE** including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **TARGET CELL PHONE** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **TARGET CELL PHONE** will connect at the beginning and end of each communication.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **TARGET CELL PHONE**.

c. Information about the location of the **TARGET CELL PHONE** for a period of 30 days, during all times of day and night. "Information about the location of **TARGET CELL PHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government

3

shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii.  This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b), involving Arianna NZE, George WOODS, Darius JARRETT, Kenneth BEVERLY, Carlos GARZA, Dante MCDONALD, Corey HUDSON, Decerdric DAVIDSON and other unknown persons prospectively for a period of 30 days from the date of this warrant.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.

4